Filed 12/28/21  In re Zion W. CA2/3

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(a). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115(a).

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| In re Zion W. et al., Persons Coming Under the Juvenile Court Law. | B311497 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. S.S., Defendant and Appellant. | Los Angeles County Super. Ct. Nos. 18CCJP06934A–B |

APPEAL from orders of the Superior Court of Los Angeles County, Martha A. Matthews, Judge. Affirmed.

Pamela Deavours, under appointment by the Court of Appeal, for Defendant and Appellant.

Rodrigo A. Castro-Silva, County Counsel, Kim Nemoy, Assistant County Counsel, Jacklyn K. Louie, Deputy County Counsel, for Plaintiff and Respondent.

## INTRODUCTION

S.S. (mother) appeals from orders entered under Welfare and Institutions Code section 366.21, subdivision (e).[1] She contends the juvenile court erred by finding that the Department of Children and Family Services (Department) provided her with reasonable reunification services. She also argues the court erred by finding that the Indian Child Welfare Act (ICWA) does not apply. We affirm.

## PROCEDURAL BACKGROUND

The family in this case consists of mother, Zion W. (born 2018), Z.W. (born 2019), and Travon W. (father), who did not participate in the dependency proceedings and is not a party to this appeal.[2]

### 1. Initial Proceedings on Behalf of Zion

On October 26, 2018, the Department filed a juvenile dependency petition under section 300, subdivisions (a) and (b)(1), on behalf of Zion, who was then one month old. The petition alleged father and mother had engaged in domestic violence in Zion's presence (count a-1), mother failed to protect Zion from the violence (count b-1), and mother had a history of substance abuse and was a current abuser of marijuana,

---

[1] All undesignated statutory references are to the Welfare and Institutions Code.

[2] When dependency proceedings began, mother and father were not in a romantic relationship. As discussed below, however, they appear to have reunited and married in August 2020.

rendering her incapable of caring for and supervising Zion (count b-2).

On October 29, 2018, the court detained Zion from father and released him to mother.

On November 26, 2018, the Department filed a first amended dependency petition, which added an additional count under section 300, subdivision (b)(1), concerning father's criminal history (count b-3). The original petition was dismissed on November 27, 2018.

At the January 24, 2019 adjudication hearing, the court dismissed count b-2 (mother's substance abuse) and sustained the remaining counts. The court declared Zion a dependent of the court, removed him from father, and placed him with mother on the condition that mother and Zion reside with the maternal grandmother.

The court ordered family maintenance services for mother. Her case plan included: 10 weekly on-demand, consecutive drug tests with a full drug program in the event of any missed or positive test, a domestic violence support group for victims, parenting classes, and individual counseling to address case issues including delinquency history, grief and loss, domestic violence and its effects on children, co-parenting, anger management, and conflict resolution. As relevant here, the court also ordered mother to keep the Department informed of her address and telephone number and not to remove Zion from Southern California or Kern County.

At the July 25, 2019 judicial review hearing, the court found mother was in compliance with her case plan, and the Department had provided reasonable services. The court ordered continued family maintenance services to January 23, 2020.

## 2. Further Proceedings in November and December 2019

### 2.1. Initial Proceedings on Behalf of Z.W.

On November 15, 2019, the Department filed a petition under section 300, subdivisions (a), (b)(1), and (j), on behalf of Z.W., who was then two months old. The petition alleged, in counts a-1, b-1, and j-1, that father and mother had a history of domestic violence, including in sibling Zion's presence, from which mother had failed to protect Zion, and that the violence and failure to protect caused Zion to be a current dependent of the juvenile court. In count b-2, the petition alleged mother was a current abuser of marijuana, opiates, and hydrocodone, had tested positive for marijuana on April 25, 2019, and had tested positive for opiates and hydrocodone on October 3, 2019. In count b-3, the petition alleged father abused cocaine, marijuana, and ecstasy. On November 18, 2019, the court detained Z.W. from both parents.

At the December 13, 2019 adjudication hearing, the court dismissed counts a-1 and b-1 (domestic violence), sustained count b-2 (mother's drug use) as amended to strike the language about opiates and hydrocodone, and sustained count b-3 (father's drug use). Count j-1 was stricken and its allegations regarding domestic violence and mother's failure to protect were amended and re-pled under subdivision (b)(1) as count b-4. As re-pled and amended, count b-4 was sustained.

The court declared Z.W. a dependent of the court, removed her from father, and placed her with mother on the condition that she reside with the maternal grandmother or in another Department-approved location. The court entered a mutual stay-away order for mother and father and ordered family maintenance services for mother. Mother's case plan included

4

biweekly or on-demand drug tests, with a full drug program if mother missed any test or showed anything other than low or decreasing levels of marijuana, a 26-week support group for domestic violence victims, parenting classes if not already completed, and individual counseling to address case issues, breaking the domestic violence cycle, and co-dependency. As relevant here, the court also ordered mother to keep the Department informed of her address and telephone number and not to remove Z.W. from Southern California or Kern County. Father was not provided with services but was granted monitored visitation.

### 2.2. Additional Petitions on Behalf of Zion

On November 15, 2019, the day it filed the initial petition on behalf of Z.W., the Department also filed a subsequent petition under section 342 on behalf of Zion, which mirrored the allegations in Z.W.'s section 300 petition, discussed above.

That day, the Department also filed a supplemental petition on behalf of Zion under section 387. Count s-1 alleged that the parents had continued to engage in violent altercations, including mutual combat on November 3, 2019; mother permitted father access to Zion in violation of court orders; and mother failed to protect Zion. Count s-2 alleged that mother had violated court orders by missing eight drug tests, testing positive for marijuana on April 25, 2019, and testing positive for opiates and hydrocodone on October 3, 2019.

The court detained Zion from both parents.

At the December 13, 2019 adjudication hearing, the court dismissed the section 387 petition without prejudice. As to the section 342 petition, the court amended count b-1 to allege that mother was a current marijuana user, tested positive for

marijuana on April 25, 2019, missed eight tests in 2019, and was occasionally under the influence of marijuana while caring for Zion. As amended, the court sustained count b-1. The court amended count b-3 to state that parents continued to engage in altercations, including on November 3, 2019, and mother provided inadequate protection to Zion by allowing father access to him. As amended, the court sustained count b-3. The court sustained count b-2 (father's drug use) as pled and struck count b-4 (failure to comply with court orders).

The court removed Zion from father and placed him with mother under the supervision of the Department and on the condition they reside with the maternal grandmother or in a Department-approved location. The court again issued a mutual stay-away order to the parents and ordered the family maintenance services for mother discussed above.

### 3. The Department Files Additional Petitions in 2020, and the Children are Removed from Mother

On February 7, 2020, the Department filed a supplemental section 387 petition on behalf of both children. Count s-1 alleged that mother left the maternal grandmother's home with the children in violation of the court's order, failed to notify the Department she had moved, failed to provide the Department or court with her address, and failed to comply with her case plan. On February 10, 2020, the Department requested a protective custody warrant for Zion and Z.W. after the Department was unable to locate either mother or the children.

At the February 10, 2020 detention hearing, the court detained the children from mother and ordered monitored visitation at the Department's offices. The court issued a warrant for mother's arrest under section 339 and a protective custody

6

warrant for Zion and Z.W. under section 340. A month later, on March 10, 2020, mother and the children were located and the warrants were recalled and quashed.

The adjudication hearing scheduled for April 1, 2020 was continued to April 29, 2020, then to August 19, 2020 due to the Covid-19 emergency.

On April 24, 2020, the Department filed a subsequent petition under section 342 on behalf of both children. The petition contained one count, pled under section 300, subdivision (b)(1), which alleged mother had mental health and emotional problems, including suicidal ideation, and that mother sent a text message on March 17, 2020, implying she would hurt herself. At the detention hearing later that day, the court again detained the children from mother. The court denied mother's request for unmonitored visitation and ordered monitored visitation at a Department-approved location.

The adjudication hearing for both petitions was held on August 19, 2020.[3] As to the section 387 petition, the court amended count s-1 to allege that mother failed to keep the Department informed of her and the children's whereabouts or allow the Department to visit and assess the children's safety from January 27, 2020 to March 4, 2020, in violation of the court's order and had failed to participate regularly in court-

---

[3] Mother testified at the hearing that she had neither traveled to nor lived in Las Vegas or outside of Southern California with the children at any time from December 2019 to the present, and claimed she had been living with the maternal grandmother during that time. She asserted she had been staying away from father. Later that day, however, the Department received information that mother had married father in Las Vegas.

ordered drug testing. As amended, the court sustained the allegation. As to the section 342 petition, the court sustained count b-1 as pled.

The court found the previous dispositions of the court had been ineffective in protecting the children. The court also found there was evidence that the children's developmental needs were not being addressed and that mother had refused to allow the Regional Center to assess them.

The court removed the children from mother and ordered family reunification services. Mother's case plan included participation in 10 random, on-demand consecutive drug tests, with any missed test or test positive for anything other than low levels of marijuana resulting in a full drug rehabilitation program with random testing; parenting classes; individual counseling with a Department-approved therapist; a psychological assessment; a psychiatric evaluation; and transportation assistance. The court ordered visitation at a neutral or public Department-approved location, monitored by Department staff, with discretion to allow other monitors if mother visited consistently.

Mother filed a timely notice of appeal, which was assigned case No. B307193.[4]

---

[4] The appeal was ultimately consolidated under that case number with a later appeal, case No. B308116, from orders discussed below. By stipulation of the parties, the consolidated appeal was remanded to the juvenile court on May 4, 2021, with directions related to ICWA.

### 4. The Department Petitions to Modify Visitation in August 2020

On September 1, 2020, the Department filed a petition under section 388 asking the court to change the visitation order entered the previous week. The court had ordered mother to receive three 3-hour visits per week in a neutral location approved by the Department, supervised by a Department monitor. The Department asked the court to order weekly monitored virtual visits instead. The Department described mother's claims that she had been assaulted and that her life and the children's lives were at risk from father's associates, described mother's concerning behavior during an emotional plea to the social worker about the danger, and noted that she was not actively visiting the children.

On September 17, 2020, at the initial hearing on the petition, the court ordered monitored visits for mother by a Department-approved monitor other than the caregiver to take place at Department offices or a police station until the October evidentiary hearing. The court ordered that mother could also have monitored virtual or telephone visits, and the caregiver could monitor those visits.

At the October 2, 2020 section 388 hearing, the court found mother had episodes in which she was agitated, upset, and behaved unpredictably.[5] The court found mother's behavior placed the children at risk because it could cause her to act impulsively during a visit and could frighten the children. Because the Department offices were closed, virtual visits were

---

[5] At this hearing, mother testified that she was not in a relationship and had not married father.

the only way to ensure the children's safety. Thus, the court concluded the Department had established a change in circumstances in light of this new information, and virtual visitation would be in the children's best interests. The court granted the petition and ordered the Department to work with the children's caregiver to plan a virtual visitation schedule. The visits, which would remain virtual until the Department offices reopened, should occur a minimum of three times per week; once the Department's offices reopened, mother was to have monitored visitation there.

Mother filed a timely notice of appeal from the September 17, 2020 and October 2, 2020 hearings, which was assigned case No. B308116.

**5. Six-Month Review Hearing in March 2021**

On March 3, 2021, the court held a six-month review hearing under section 366.21, subdivision (e). Mother testified. After the court received evidence indicating mother had substantially complied with her case plan, the hearing was continued to March 23, 2021, to address evidence that mother had secretly married father and moved to Las Vegas.

At the continued hearing, the court issued its tentative ruling that the Department had met its burden of proof, noting that mother had six missed drug tests in the previous two months; was living either full-or part-time with father in Las Vegas, which she had failed to disclose to the social worker; underwent a psychological assessment that suggested she suffered from fairly serious mental health problems; and seemed to have stability issues. Mother asked the court to place the children with her, or, alternatively, to order unmonitored, overnight visitation.

10

The court found mother's credibility was "limited." It commented that mother's statement that she was not in a relationship with father was not true, and "it's really not possible to make substantive progress on addressing the issues that have caused a risk of harm to children if mother is concealing very basic facts about her living situation from the Department … ." The court explained that mother's "technical compliance with her case plan is far less important than the fact that she's not at all transparent about her actual living situation." The court also noted that mother was not in compliance with her case plan because she missed drug tests and had not participated in a drug program, and noted mother suggested in a conversation with the social worker that she was under the influence of something when she married father. The court explained that because the children are so young, they would not be able to disclose if they were exposed to domestic violence.

Thus, the court held it would be detrimental to return the children to either parent, and mother was in partial compliance with her case plan. The court found reasonable services were provided to the parents. The court ordered the Department to work with the caregiver to ensure the children were receiving all necessary developmental services.

Mother filed a timely notice of appeal.

## FACTUAL BACKGROUND

### 1.    Family History

Mother, who had a welfare history of her own as a child, which included being a victim of human trafficking and being spanked by her adult brother with a belt as a form of discipline, was 19 years old at the start of Zion's juvenile dependency case.

11

She had completed school through 10th grade and had been on probation as a minor for several offenses.

Mother met father through a friend when father was incarcerated; mother was 16 and father was 20. Father's CLETS report reflects convictions for second degree robbery (Pen. Code, § 211) and misdemeanor vandalism (*id.*, § 594, subd. (a)(2)) as well as several arrests that do not appear to have resulted in convictions.

Zion was born in August 2018.

## 2.     2018 Domestic Violence Referral

This case stems from an October 20, 2018 referral related to a physical altercation between father and mother in Zion's presence; father was the aggressor.

A week after the referral, a HUB doctor indicated that Zion was underweight, and Zion's foster mother told the Department that mother had been diluting ready-made formula. After the doctor explained that formula should not be diluted so that the child could receive all of its nutrients, Zion's growth insufficiency was "completely resolved," and he showed normal growth and development.

Otherwise, Zion appeared healthy and showed no signs of abuse or neglect. Mother appeared to appropriately care for him, soothe him, and handle him, and there were no evident safety concerns in mother's home. During the Department's monthly visits, social workers observed a strong bond between mother and Zion. Mother disclosed that she smoked marijuana but said she did not smoke around Zion.

During the first family maintenance period, mother was pregnant with her second child with father. During the first half of 2019, she successfully completed a domestic violence class, 12

sessions of a domestic violence support group, and six parenting classes.

### 3. 2019 Domestic Violence Referral

Z.W. was born in September 2019. Mother tested positive for opiates and hydrocodone on October 3, 2019, which she explained was due to the pain medication she had been prescribed after she gave birth via C-section.

On November 4, 2019, the Department received a second domestic violence referral for an incident the previous day between mother and father. Mother denied that the altercation had been physical but agreed to a safety plan in which the maternal grandmother would monitor visitation with the children.

Mother began individual counseling in December 2019. She discussed the traumas in her life, domestic violence, what triggered her anger, her reactions to things, and coping skills.

### 4. Post-Removal Events in 2020

By January, however, the Department reported that mother was no longer attending individual therapy and had missed many of her drug tests. Family preservation services had been terminated due to nonparticipation.

When the Department went to the maternal grandmother's home to check on the children on January 17, 2020, they were not there. Nor could the Department locate them on January 21, 23, and 31, 2020, or on February 3, 2020.

On January 27, 2020, mother told the social worker that she had relocated to Las Vegas with the children. She said she planned to be back in Los Angeles the following day and would meet the social worker at the Department's office. Mother

13

declined to provide her contact information in Las Vegas but said she would provide the social worker with a copy of her lease. Mother did not appear at the Department's office the next day, however.

The maternal grandmother contacted the social worker on March 4, 2020, and reported that the children were at her home. Mother called the social worker shortly thereafter, threatened the social worker with profanity, and stated the Department would not take her children. Mother soon called back, however, and said she would bring the children to the Department's office. She left the children with the social worker in the lobby that day, but did not provide proper clothing, formula, a bottle, or diapers. Thirty minutes after dropping off the children, mother called back and said she was relinquishing her parental rights to her mother.

Zion appeared well cared-for, but the foster mother reported that at almost six months old, Z.W. could not hold her head up, sit up, or roll over; nor was she trying to crawl. Z.W.'s pediatrician referred her to the Regional Center. Similarly, Zion had speech delays and was not meeting his developmental milestones. Thus, on March 6, 2020, the Department referred the children for a Regional Center assessment and mental health services.

During mother's March 13, 2020 visit at the Department's office, the foster mother expressed concern that mother was planning to leave with the children. Mother brought a diaper bag of clothes and formula for the children. Building security was advised, and two social workers entered the room to monitor the visit.

On March 30, 2020, mother refused to consent to or participate in the children's assessment by the Regional Center.

14

The Department indicated that the Regional Center could assess the children without mother's consent but would not be able to provide services for the children if they were found eligible.

On May 29, 2020, twice-weekly in-person visits with the children had been scheduled, with the caregiver monitoring the visits. On June 1, however, mother declined to have the visits and said she was going to focus on her classes. Then, on June 9, she again requested in-person visits.

On June 9, 2020, mother again refused to consent to the children's assessment by the Regional Center. Both children were ultimately assessed and both were found to have delays.

At her in-person visit the next day, mother was two hours late, spent the visit on her phone, and sent the social worker a text message saying that she wanted the children to be moved again because she did not like the paternal aunt— notwithstanding she had asked the Department to place the children with the paternal aunt several months earlier.

The following week, the paternal aunt indicated that mother became hostile and argumentative in front of the children. Mother was verbally aggressive as the aunt tried to put the children in the car; the children were crying. The caregiver called law enforcement to help her get Zion and Z.W. into the car.

On July 1, 2020, mother called the social worker and indicated she was in a relationship with an enemy of father's, and when father found out, her tooth was "knocked out." Mother said she was leaving town to get away from father, and she would not be visiting the children in the future. Then, on July 13, 2020, the social worker arrived in the lobby of the Department's office to find mother crying hysterically and shaking. Mother said the

children needed to be immediately moved from the caregiver's home because mother was scared for their lives and her own.

Mother cancelled her visit on July 8, 2020, and did not attend her July 22, 2020 visit. She failed to confirm her July 29, 2020 visit, and when it was cancelled, she called the social worker and threatened to harm the caregiver if she did not bring the children to the visit. Mother did not attend her August 5, 2020 visit.

Things appeared to improve in late summer, however.[6] Mother enrolled in a parenting class on August 26, 2020, and although she was not enrolled in individual counseling, she was waiting to be scheduled for a psychiatric evaluation. On September 19, 2020, mother and the caregiver agreed to a schedule for virtual visitation. The Los Angeles County Department of Mental Health reported that mother had enrolled in individual counseling on September 28, 2020; she began weekly therapy that day. On December 30, 2020, mother's therapist indicated that mother had made progress. On January 25, 2021, however, the therapist indicated that going forward, she would only be able to see mother once per month due to her large case load.

Meanwhile, mother finished her 12-session parenting course in January 2021. The instructor reported that mother "exudes a positive and open attitude towards learning new parenting concepts. She participates in each zoom class discussion and asked questions for clarification as needed.

---

[6] Unbeknownst to the Department at the time, mother married father in Las Vegas on August 19, 2020.

[Mother] openly addresses issues that brought her to the attention of DCFS."

By the time of the six-month review hearing in March 2021, mother had been engaged in her weekly virtual visits with Zion and Z.W. and was getting along well with the caregiver.

But that was also the month that the Las Vegas deception unraveled.

### 5.　The Las Vegas Investigation

At the six-month review hearing, the Department told the court that mother was still unpredictable because she continued to provide "false information" to both the Department and the court and refused to provide her address.

On March 5, 2021, a property management company in Las Vegas, Nevada told the Department that mother's address was in Las Vegas, but would not provide her apartment number. The Department later learned that father had made an injury report to the Las Vegas Metropolitan Police Department the previous October and had provided the same address as that provided by the management company for mother. A management company employee told the Department, "she is so cute pregnant."

On March 8, 2021, a Department social worker went to the maternal grandmother's home. Although the maternal grandmother wasn't home, a neighbor said that mother "comes by every now and then and she appeared pregnant."

The Department also reported that father's social worker from a dependency case involving father's other child indicated father resided in Las Vegas, was arrested there on November 16, 2020, and the mother of his other child said a mutual friend told her that father was married and expecting a child with a woman in Las Vegas.

On March 10, 2021, mother contacted the Department to provide her new contact number, but declined to meet with the social worker in person on March 12, 2021, and said her mother could sign any required documents on her behalf. When the social worker asked if mother was married, she replied, "I went to Vegas on some mad stuff and got married."

She denied she was pregnant, however, and threatened the mother of father's other child and accused her of providing information to the Department. Via FaceTime with the social worker, mother displayed her stomach area. The social worker reported she believed she was observing a "pregnant belly"; mother said she would take a pregnancy test at a doctor's office and provide the results to the Department.[7] Mother also denied that she lived in Las Vegas and said she lived in her mother's home.

The Department subsequently received an anonymous text message containing a video. The message said the video was taken at the beginning of February. The video showed mother and father popping a balloon; writing on the video said "it's a girl."

## DISCUSSION

1. **The court's reasonable-services finding is supported by substantial evidence.**

Mother contends the court erred by finding the Department had provided her with reasonable reunification services. Specifically, she argues that she received too few individual

---

[7] There is no evidence she ever did so.

therapy sessions and lacked access to the children's developmental treatments. We disagree.

### 1.1. Legal Principles and Standard of Review

When a child is removed from a parent's custody, the court, typically, must order child welfare services for the child and the parent to facilitate family reunification. (§ 361.5, subd. (a); *Tonya M. v. Superior Court* (2007) 42 Cal.4th 836, 843.) If the dependent child is younger than three when he or she is removed, reunification services must be provided for at least six months from the disposition hearing but, ordinarily, not longer than 12 months from the date the child entered foster care. (§ 361.5, subd. (a)(B).)

The Department must make a good faith effort to develop and implement the family reunification plan. (*In re Jasmon O.* (1994) 8 Cal.4th 398, 424.) In particular, reunification services should be tailored to the particular needs of the family. (*David B. v. Superior Court* (2004) 123 Cal.App.4th 768, 788.) The Department's efforts must, therefore, be judged according to the circumstances of each particular case. (*In re Taylor J.* (2014) 223 Cal.App.4th 1446, 1451.)

We review a court's finding for substantial evidence from which the court could conclude there was clear and convincing evidence that the Department provided reasonable services. (*In re Alvin R.* (2003) 108 Cal.App.4th 962, 971.) In determining whether substantial evidence exists, we review the evidence in the light most favorable to the prevailing party and indulge all legitimate and reasonable inferences to uphold the ruling. (*In re Misako R.* (1991) 2 Cal.App.4th 538, 545.) The standard is not whether the services provided were the best that might have

been provided, but rather whether they were reasonable under the circumstances. (*Id.* at p 547.)

### 1.2. The Department provided reasonable services.

Mother argues that the crucial service being provided to her was individual counseling, and that service was "severely impacted" during the review period. Mother's case plan called for weekly individual counseling, which she began on September 28, 2020. On December 30, 2020, the therapist reported that mother appeared to have made progress. On January 25, 2021, however, the therapist indicated that going forward, due to her large caseload, she would only be able to see mother once every four to six weeks. Thus, although mother received weekly individual counseling for the first four months of the review period, she seems to have received only monthly individual counseling for the last two months. Mother contends the Department "made no effort to refer mother to a therapist who had a lighter case load or who could see [her] on a weekly basis as recommended by her providers." Therefore, she argues, the Department failed to make reasonable efforts to assure she had access to weekly therapy.

Certainly, mother appears to have benefitted from individual therapy. Mother testified that the sessions were helpful because they talked about her past as well as her present situation, and her therapist helped guide her as to how to react to different situations and helped her to learn coping skills. In her sessions, she worked on her feelings, concerns, and fears. Mother testified that her therapist was a big influence on her; she talked to her therapist about everything. For example, mother previously thought the caregiver was against her and felt angry; she learned through therapy that she was wrong.

Mother's improved communication skills were not only the result of individual counseling, however. Mother also testified that she learned to communicate better with the caregiver because she kept in touch with the instructors from her parenting classes, who talked to her about different ways to communicate.

Mother's Department of Mental Health treatment plan had suggested that she receive individual counseling once every two months. It also suggested that a weekly group class would be helpful to reduce her sad mood and angry outbursts. It did not mandate weekly individual sessions. Nevertheless, additional individual sessions with mother's *current* therapist would probably have been helpful. But it is not obvious that additional sessions with a *different* therapist, with whom she had no relationship and would have to start from scratch, would be more helpful than limited sessions with the therapist she already had.

Mother acknowledges her lies to the Department and the court, which she frames as "trying to pretend that she had not married father or had not become impregnated with another of his children, or was not going back and forth to Las Vegas," but she insists the lies are "a core issue that only can be addressed with intensive services." Although there is evidence mother's individual counseling helped with her anger and communication issues, however, there is no evidence in the record before us that the counseling addressed her repeated, substantial lies about her relationship with father and where she lived. If it did, it did not seem to help. Indeed, immediately after testifying about the benefits of therapy, mother told the court she did not have a relationship with father and last communicated with him when the children were detained. In fact, they were married and expecting a third child.

Finally, mother suggests that she should have been offered opportunities to communicate with the children's developmental services providers and participate in their treatments. But the court did not view mother's minimization of the children's developmental delays as a barrier to reunification. To the contrary, at the six-month-review hearing, the court indicated it was inclined to return the children to mother because the Department had not proven they would be at risk if they were returned to her. It was only after the court learned mother had lied about her relationship with father and was concealing "very basic facts about her living situation from the Department" that the court concluded return would be detrimental. As the children's developmental needs were not a barrier to reunification, the court did not err by concluding the Department had provided reasonable services.

## 2. Mother's ICWA claim is not ripe.

On May 4, 2021, this court entered a stipulated remand order in case No. B307193 in which we directed the juvenile court to order the Department "to investigate mother's claimed Cherokee heritage and inquire of the father, if available, and the paternal family regarding any known Indian heritage, and send notices to the Cherokee and any appropriate tribe(s) and the Bureau of Indian Affairs, and to submit a report on its investigation as well as those notices, return receipts, and any tribal or agency responses to the juvenile court. [Citation.]"

In this appeal, mother "again raises the issue of noncompliance with the ICWA … because the [juvenile] court found on March 3, 2021 that the ICWA did not apply." Mother acknowledges that the lower court's ruling predates our remand order but nevertheless asks us to "affirm the directions from [the

22

remand order] for each and all of the reasons argued in her opening brief in case number B307193." Because we have already granted the relief mother seeks, we decline to do so. (See *People ex rel. Lynch v. Superior Court* (1970) 1 Cal.3d 910 [courts should not issue advisory opinions].)

## DISPOSITION

The orders are affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

LAVIN, J.

WE CONCUR:

EDMON, P. J.

EGERTON, J.